UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

The Cincinnati Insurance
Company,
     Plaintiff

     v.                             Civil No. 03-cv-410-SM
                                   Opinion No. 2005 DNH 096

Fab Tech, Inc., d/b/a Corle
Building Systems; Seacoast
Crane Company, Inc.; Peerless
Insurance Company a/s/o
Crowning Holdings, Inc.;
Federal Insurance Company
a/s/o Lason Systems, Inc.;
and North American Specialty
Insurance Company,
     Defendants

**O R D E R**

The Cincinnati Insurance Company ("Cincinnati") seeks

judgment declaring that it is not obligated to defend or

indemnify its insured, Fab Tech, Inc. ("Fab Tech"), in a

subrogation action brought by Peerless Insurance Company

("Peerless") and Federal Insurance Company ("Federal").[1]  It also

seeks a declaration that North American Specialty Insurance

---

    [1] The underlying subrogation action will be referred to as
"the Peerless action."

Company ("North American")[2] is obligated to provide Fab Tech a
defense against claims arising from the collapse of a building
that Fab Tech designed and fabricated for Crowning Holdings, Inc.
("Crowning") while acting as a subcontractor to Seacoast Crane
Company ("Seacoast").  Before the court are motions for summary
judgment filed by Cincinnati, North American, Peerless, Fab Tech,
and Federal.

### Summary Judgment Standard

Summary judgment is appropriate when the record reveals "no
genuine issue as to any material fact and . . . the moving party
is entitled to a judgment as a matter of law."  FED. R. CIV. P.
56(c).  "The role of summary judgment is to pierce the
boilerplate of the pleadings and provide a means for prompt
disposition of cases in which no trial-worthy issue exists."
Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing
Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).
When ruling on a party's motion for summary judgment, the court

---

[2] North American is the successor in interest to
Underwriters Insurance Company, which issued an insurance policy
to Fab Tech which is a subject of this litigation.  For
convenience, that policy is referred to as "the North American
policy."

must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003) (citing Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 185 (1st Cir. 2003)).

## Background

On August 14, 1996, Seacoast entered into an agreement with Crowning under which Seacoast constructed an 80-foot by 180-foot pre-engineered building addition for Crowning.  The work was to be completed "within 14 weeks of Site Plan Approval by town or issuance of a building permit by Town."  (Peerless Mot. Summ. J., Ex. 2 at 1.)  The agreement called for the building to be designed, fabricated, and constructed in conformity with the 1990 BOCA Code.  (Id. at 7.)  The roof was to be capable of bearing a snow load of 42 PSF.  (Id.)  The total cost was agreed to be $284,270.  (Id. at 2.)  The "Bid Price Sheet" completed by Seacoast included the following items and prices: Pre-engineered steel building/All sitework, foundation, excavation and roof, $224,000; Demolition, $6,250; Sprinkler System, $14,150;

Electrical, $8,835; Heating, $12,800; Alarms, $1,035; Paving, $16,000; and Miscellaneous, $1,200.  (Id. at 14.)

Seacoast subcontracted with Corle Building Systems, Inc.[3] for the design and fabrication of the building's component parts by means of a purchase order dated September 6, 1996.  (Peerless Mot. Summ. J., Ex. 1.)  That purchase order reflected a cost of $58,365.50 (id. at 3), and included the following special condition: "John Corle [of Fab Tech] has agreed to a six week turnaround on this project.  Please deliver no later than Oct. 18, 1996."  (Id. at 5.)  "The work performed in connection with the addition in question was completed during the time period September of 1996 through February of 1997."  (North American Mot. Summ. J., Ex. 1 (First Set of Interrogs. to Seacoast) at 8.)[4]  Under its agreement with Seacoast, Fab Tech designed and

---

[3] Fab Tech is the successor in interest to Corle Building Systems.  For convenience, the name "Fab Tech" is used throughout to refer to both entities.

[4] On this point, Seacoast concedes that "[a]ll work performed by Fab Tech pursuant to the [purchase order] was completed prior to November 8, 1999" and that "[a]ll of [its] work performed in connection with the building and addition was completed prior to November 8, 1999."  (North American Mot. Summ. J., Ex. 4 (Seacoast's Resp. to North American's First Set of Reqs. for Admis.) at 2.)  Fab Tech has also conceded that its "design and fabrication of the addition, and any additional work

4

fabricated the component parts of the building addition in
Pennsylvania and shipped them to New Hampshire, where the
building was assembled by another Seacoast subcontractor, Cyr
Construction.

For purposes of resolving the pending questions, it is
assumed, but not found, that the building addition Fab Tech
designed, and for which it fabricated the component parts,
collapsed on March 14, 2001, under a snow load lighter than that
specified in both the agreement between Crowning and Seacoast,
and the agreement between Seacoast and Fab Tech.  At the time of
the collapse, Fab Tech was covered under three insurance policies
at issue here: (1) an Architects and Engineers Professional
Liability Insurance Policy issued by North American (Cincinnati's
Mot. Summ. J., Ex. J); (2) a Commercial General Liability policy
issued by Cincinnati (Cincinnati's Mot. Summ. J., Ex. E); and (3)
a Commercial Umbrella Liability Policy also issued by Cincinnati
(Cincinnati's Mot. Summ. J., Ex. F).

_____

performed in connection with said addition, was completed prior
to November 8, 1999."  (North American Mot. Summ. J., Ex. 5 (Fab
Tech's Resp. to North American's First Set of Reqs. for Admis.)
at 4.)

On March 20, 2001, Fab Tech filed a notice of occurrence/claim with North American stating, as the occurrence, "[b]uilding manufactured by insured collapsed." (North American's Mot. Summ. J., Ex. 7.) By letter dated November 23, 2001, Target Professional Associates, acting on behalf of North American, denied coverage, explaining:

> "[T]he work performed by your company was performed on or about September 16, 1996. The retroactive date of this policy is November 9, 1999. Because the work performed was prior to the policy's retroactive date, there is no coverage for this matter.
>
> We hereby disclaim coverage for this claim. We will provide neither a defense nor indemnity for this matter. You are urged to immediately retain your own private counsel to protect your interests at your own expense.

(North American Mot. Summ. J., Ex. 8.)

Peerless and Federal, however, both paid claims arising out of the roof collapse. The building's owner, Crowning, claimed reconstruction costs of $366,375.71. (Cincinnati's Mot. Summ. J., Ex. C (Peerless's Answers to Cincinnati's Interrogs.) at 2.) Peerless paid $346,847.88 on that claim (id.), and paid "additional expenses in the amount of $66,162.80 for demolition,

$16,612.13 for stabilization of the building after the collapse, and $4,519.84 for snow removal and consulting service relating to stabilization after the loss." (Id.) Crowning's tenant, Lason Systems, Inc. ("Lason"), a document storage company, claimed damages related to document drying of $388,132.46 and "extra expenses resulting from the collapse in the amount of $777,381.66 for moving the boxes [of documents] to the new warehouse, temporary manpower at the new warehouse, temporary warehouse leasing, moving back to the reconstructed building, and miscellaneous personal property and supplies." (Cincinnati Mot. Summ. J., Ex. D (Federal's Answers to Cincinnati's Interrogs.) at 2.) Federal paid both those claims. (Id.)

By writ of summons dated December 5, 2002, Peerless, as subrogee of Crowning, and Federal, as subrogee of Lason, sued Seacoast and Fab Tech in the New Hampshire Superior Court to recover payments they made to their respective insureds.

The state court writ in the Peerless action alleged:

On or about July 26, 1996, the defendant Seacoast Crane submitted to Crowning Holdings a proposal to construct a prefabricated building as an addition to

7

the existing masonry and frame building located at 527
Mammoth Road, Londonderry, New Hampshire.

In this proposal, the defendant Seacoast Crane
expressly represented that the new addition would be
designed, fabricated and constructed with a roof live
load of 42 PSF, and further that it would be designed,
fabricated and constructed in compliance with the BOCA
1990 Code.

On or about October 5, 1996, plaintiff Crowning
Holdings and defendant Seacoast Crane entered into an
agreement for the construction of the addition
specified in Seacoast Crane's original proposal.  A
copy of said proposal is attached as Exhibit A.

Defendant Seacoast Crane subsequently
subcontracted with defendant Fab Tech, Inc., Corle
Building Systems and/or Corle Information Services,
Inc. (collectively referred to as the Corle defendants
hereinafter) for the design and fabrication of the
building's component parts.

Fab Tech and/or the Corle defendants prepared
design plans for the building in which they
affirmatively represented that the building, as
designed, fabricated and constructed would comply with
the 1990 BOCA Code, and that it would have a 42 PSF
roof snow load.

(Cincinnati Mot. Summ. J., Ex. A at 3-4.)  Based upon those

factual allegations, Peerless and Federal asserted the following

claims against Fab Tech: strict liability, negligence, negligent

misrepresentation, violation of N.H. REV. STAT. ANN. § 358-A,

breach of express warranties, and breach of implied warranties.

8

Fab Tech did not provide written notice of the Peerless/ Federal suit to North American, but did provide notice to Cincinnati, which is defending under a reservation of rights. (North American Mot. Summ. J., Ex. 5 at 5-6.)

Cincinnati filed a two-count declaratory judgment action in this court seeking a determination that it has no duty to defend or indemnify Fab Tech in the <u>Peerless</u> action, and a declaration that North American has a duty to defend Fab Tech and is liable to Cincinnati for all or some of the defense costs Cincinnati has already expended.

**Discussion**

<u>I. Count I: Cincinnati's Obligation to Fab Tech</u>

In Count I of its petition for declaratory judgment, Cincinnati asserts that insurance coverage is not available under either the Commercial General Liability ("CGL") policy or the Commercial Umbrella Policy because: (1) the March 14, 2001, roof collapse was not an "occurrence" as that term is defined by the policies at issue; and (2) coverage is precluded by various policy exclusions including those for damage to: (a) real

property on which Fab Tech worked (exclusion (j)(5) in the CGL policy); (b) property that must be restored because Fab Tech's work was incorrectly performed on it (exclusion (j)(6) in the CGL policy); (c) Fab Tech's product (exclusion (k) in the CGL policy; exclusion 5 in the Umbrella policy); (d) Fab Tech's work (exclusion (l) in the CGL policy; exclusion 6 in the Umbrella policy); and (e) impaired property or property not physically injured (exclusion (m) in the CGL policy).

In its motion for summary judgment, Cincinnati refines its claims somewhat, arguing that: (1) "it does not owe a duty to indemnify Fab Tech against Peerless's entire subrogation claim as this claim is excluded from coverage under both the CGL and Umbrella policies by operation of the 'Damage To Your Product' and/or 'Damage To Your Work' exclusions . . . and does not owe a duty to indemnify Fab Tech against Federal's subrogation claim for expenses incurred in moving boxes into a new warehouse, temporary warehouse manpower, temporary warehouse leasing, and the cost to move boxes back into the building once it was reconstructed."  Cincinnati's second argument, that it is not liable for the moving and storage expenses paid by Federal to

Lason, is based upon an assertion that those expenses fall
outside the definition of "property damage."

A. Occurrence

Both the CGL policy and the Umbrella policy provide coverage
for property damage resulting from occurrences.  Both policies
define the term "occurrence" to mean "an accident."  (Cincinnati
Mot. Summ. J., Ex. E at 11; Ex. F. at 12.)

> The word "accident" is not defined in the policy,
> and the term must therefore be interpreted in its
> usual, ordinary and popular sense.  "Webster has
> defined it as 'an event that takes place without one's
> foresight or expectation; an undesigned, sudden, and
> unexpected event; chance, contingency.'  Many courts
> have quoted this definition, and some have added to or
> embellished it, but in reality few have improved upon
> it."  Lacey v. Washburn & Williams Co., 164 A. 724, 725
> [(Pa. 1932)].  This definition is substantially
> repeated in United States Mutual Accident Ass'n v.
> Barry, 131 U.S. 100 [(1889)], where it was said that an
> "accident" within the meaning of an insurance policy is
> an event "happening by chance; unexpectedly taking
> place; not according to the usual course of things;" or
> "not as expected".  It seems clear that an accident is
> the antithesis of something likely to occur,
> foreseeable in due course.  If an occurrence is the
> ordinary and expected result of the performance of an
> operation, then it cannot be termed an accident.  To
> constitute an accident, the occurrence must be "an
> unusual or unexpected result attending the operation or
> performance of a usual or necessary act or event"; Hey
> v. Guarantors' Liability Indemnity Co., 37 A. 402 [(Pa.

1897)].  And see Hamilton v. American Indemnity Co., 82
Pa.Super. 191 [(1923)].

M. Schnoll & Son, Inc. v. Std. Accident Ins. Co., 154 A.2d 431,

432 (Pa. Super. Ct. 1959) (parallel citations omitted).  Based

upon that definition, there can be little doubt that, under

Pennsylvania law, the March 14, 2001, roof collapse as described

in the Peerless action was an "occurrence" for purposes of

determining coverage under the Cincinnati CGL and Umbrella

policies.


    B. Exclusion (j)(5)

    The CGL policy contains an exclusion for "[p]roperty damage"

to "[t]hat particular part of real property on which [the

insured] or any contractors or subcontractors working directly or

indirectly on [the insured's] behalf are performing operations,

if the 'property damage' arises out of those operations."

(Cincinnati Mot. Summ. J., Ex. E. at 3.)  Here, it is undisputed

that neither Fab Tech nor any contractors or subcontractors

working for Fab Tech performed any operations on any real

property that suffered property damage for which claims have been

made against the CGL policy.  Thus, exclusion (j)(5) does not bar

coverage.

### C. Exclusion (j)(6)

The CGL policy contains another exclusion for "[p]roperty

damage" to "[t]hat particular part of any property that must be

restored, repaired or replaced because '[the insured's] work' was

incorrectly performed on it."  (Cincinnati Mot. Summ. J., Ex. E

at 3.)  However, that "exclusion does not apply to 'property

damage' included in the 'products-completed operations hazard.'"

(Id.)  In turn the

> "[p]roducts-completed operations hazard" includes all .
> . . "property damage" occurring away from premises [the
> insured] own[s] or rent[s] and arising out of "[the
> insured's] product" or "[the insured's] work" except:
>
> (1)  Products that are still in [the insured's]
>      possession; or
>
> (2)  Work that has not yet been completed or abandoned.

(Id. at 11.)  Because the property damage alleged in this case

arose out of the failure of work that had been completed by Fab

Tech and/or products that had left Fab Tech's possession, and

arose away from any premises owned or rented by Fab Tech, Fab

13

Tech is seeking coverage for property damage included in the "products-completed operations hazard," which takes its claim outside the limits of exclusion (j)(6).

D. The "Your Product" exclusion

Both the CGL policy and the Umbrella policy contain exclusions for "'property damage' to 'your product' arising out of it or any part of it." (Cincinnati Mot. Summ. J., Ex. E at 3, Ex. F. at 2.) The term "your product" is defined as follows:

"Your product" means:

a.  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   (1)  [the insured];

   (2)  Others trading under [the insured's] name; or

   (3)  A person or organization whose business or assets [the insured has] acquired; and

b.  Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.

"Your product" includes:

a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

14

      b.   The providing of or failure to provide warnings or
           instructions.

      "Your product" does not include vending machines or
      other property rented to or located for the use of
      others but not sold.

(<u>Id.</u>, Ex. E at 11-12; Ex. F at 13-14.)

    Cincinnati asserts that Peerless's subrogation claim is
precluded by the "your product" exclusion, because Fab Tech is
seeking coverage for a claim arising out of property damage to
its product, i.e., the building components it designed and
fabricated for Crowning, under contract to Seacoast.  Peerless
contends that the "your product" exclusion is inapplicable,
because once Fab Tech's components were assembled and the
building was complete, the components became real property and,
thus, fell outside the definition of "your product."  Cincinnati
does not contest that argument.

    Pennsylvania law describes the relationship between
personalty and real property as follows:

        Chattels used in connection with real estate can
      fall into one of three categories.  <u>Clayton v.
      Lienhard</u>, 167 A. [321,] 322 [(Pa. 1933)].  First,

15

      chattels that are not physically attached to realty are
      always personalty.  <u>Id.</u>  Second, chattels which are
      annexed to realty in such a manner that they cannot be
      removed without materially damaging either the realty
      or the chattels are always fixtures.  <u>Id.</u> at 322.  The
      third category consists of those chattels that are
      physically connected to the real estate but can be
      removed without material injury to either the land or
      the chattels.  <u>Id.</u> at 322.  When a chattel falls into
      the third category, its status as a fixture or as
      personalty depends upon the "objective intent of the
      [owner] to permanently incorporate [the] chattel into
      real property, as evidenced by the proven facts and
      surrounding circumstances entered into evidence."  <u>Noll</u>
      <u>v. Harrisburg Area YMCA</u>, 643 A.2d 81, 88 (1994).

<u>Lehmann v. Keller</u>, 684 A.2d 618, 621 (Pa. Super. Ct. 1996)

(parallel citations omitted).


      Here, it is undisputed that the product Fab Tech provided to

Seacoast was a building, or more properly, the design and

fabrication of the component parts thereof.  It is similarly

undisputed that the component parts provided by Fab Tech were, in

fact, assembled, resulting in a finished building.  Cincinnati

does not argue, nor could it reasonably argue, that the Fab Tech

components constituted chattels rather than fixtures at the time

of the roof collapse.  Because Fab Tech's product had become a

fixture, that is, "an article . . . of personal property which

has been so annexed to the realty that it is regarded as part and

16

parcel of the land," id. (quoting <u>Smith v. Weaver</u>, 665 A.2d 1215,

1218 (Pa. Super. Ct. 1995)), it is not subject to the "your

product" exclusion.  <u>See</u> <u>Nat'l Union Fire Ins. Co. v. Structural</u>

<u>Sys. Tech., Inc.</u>, 756 F. Supp. 1232, 1239 (E.D. Mo. 1991)

(holding that a radio tower, once constructed, became "a fixture

of the real property onto which it [was] attached" and,

therefore, not subject to CGL policy "your product" exclusion).


    <u>E. The "Your Work" Exclusion</u>

    Both the CGL policy and the Umbrella policy contain

exclusions for "'property damage' to 'your work' arising out of

it or any part of it and included in the 'products-completed

operations hazard."  (Cincinnati Mot. Summ. J., Ex. E at 3-4; Ex.

F. at 2.)  The term "your work" is defined as follows:

    "Your work" means:

    a.   Work or operations performed by [the insured] or
       on [the insured's] behalf; and

    b.   Materials, parts or equipment furnished in
       connection with such work or operations.

    "Your work" includes:

    a.   Warranties or representations made at any time
       with respect to the fitness, quality, durability,
       performance or use of "your work"; and

      b.    The providing of or failure to provide warnings or
             instructions.

(Cincinnati's Mot. Summ. J., Ex. E at 12; Ex. F at 14.)

     In its petition and in its motion for summary judgment,
Cincinnati argues that Peerless's subrogation claim is entirely
precluded by the "your work" exclusion, because Fab Tech is
seeking coverage for a claim arising out of property damage to
its work, i.e., the building components it designed and
fabricated for Crowning, under contract to Seacoast.  Peerless
concedes that "[t]he cost of the unassembled structural steel
building components supplied by [Fab Tech] is included in the
Your Work exclusions set forth in the Cincinnati primary and
excess policies and, therefore, Cincinnati has no duty to
indemnity Fab Tech . . . for the cost of the structural steel
used in the replacement building . . ."   Thus, Peerless seeks a
declaration that, should it prevail in the underlying action,
Cincinnati must indemnify Fab Tech for $308,010.21.  That figure
is derived by subtracting the cost of the Fab Tech components
($58,365.50) from the total cost of rebuilding Crowning's

18

building ($366,375.71).[5]  In its objection to defendants' motions

for summary judgment, Cincinnati appears to concede that some of

the property damage caused by the roof collapse falls outside the

"your work" exclusion, and suggests that its liability to pay a

judgment against Fab Tech should not include the cost of the

components provided by Fab Tech or the costs of stabilizing and

demolishing the building after the collapse.

    Given the parties' positions, there appears to be no

dispute.  They agree that Cincinnati is not liable for the value

of the Fab Tech building components, and they agree on a value of

$58,365.50.  And Peerless does not appear to press a claim for

the costs of stabilization or demolition.  Thus, all agree that

Cincinnati must indemnify Fab Tech against Peerless's subrogation

claims to the extent those claims arise from property damage to

elements of the building other than the components that

_____

    [5] Peerless argues, in the alternative, that "Cincinnati must
provide indemnity to Fab Tech . . . for the fair and reasonable
cost of the replacement building, including but not limited to:
a) the cost of concrete, demolition, electrical, heating,
ventilation and air conditioning, plumbing, as well as the cost
of managing, supervising and erecting the steel building metal
components."

19

constitute Fab Tech's work.  In other words, the portion of Count
I pertaining to the "your work" exclusion is moot.


### F. Exclusion (m)

The CGL policy contains an exclusion for damage to impaired
property or property not physically injured.  Cincinnati cites
that exclusion in its petition for declaratory judgment, but does
not do so in its motion for summary judgment.  More importantly,
in its objection to the summary judgment motions filed by
Peerless, Federal, and Fab Tech, Cincinnati does not mention
Exclusion (m), leading the court to conclude that Cincinnati no
longer intends to rely upon that policy provision.


### G. Property Damage

As noted above, Cincinnati seeks to avoid liability for the
moving and storage expenses incurred by Lason as a result of the
roof collapse, arguing that those "extra expenses" do not qualify
as "property damage" under the policies at issue.


In both the CGL policy and the Umbrella policy, the term
"property damage" is defined as follows:

"Property damage" means:

a.   Physical injury to tangible property, including
     all resulting loss of use of that property.  All
     such loss of use shall be deemed to occur at the
     time of the physical injury that caused it; or

b.   Loss of use of tangible property that is not
     physically injured.  All such loss of use shall be
     deemed to occur at the time of the "occurrence"
     that caused it.

(Cincinnati Mot. Summ. J., Ex. E at 11; Ex. F at 13.)


     Cincinnati appears to concede that it is obligated to cover

the costs Lason incurred in drying documents that were damaged as

a result of the roof collapse, but contends, without citation to

any relevant authority, that the costs of moving Lason's property

to and from an alternate storage facility, and the costs of

alternate storage during the reconstruction of the damaged

building, are not associated with "property damage" under the

policy.  Federal, naturally, disagrees.


     While the precise issue raised by Cincinnati, i.e., its

obligation to cover economic damages resulting from property

damage, has not been addressed by the Pennsylvania Supreme Court,

it has been addressed in a decision by the Pennsylvania Court of Common Pleas.  Mattiola Construction Corp. v. Commercial Union Insurance Co., 60 Pa. D. & C.4th 412 (Pa. Ct. Com. Pl.  2002), involved a CGL policy worded identically to the CGL policy in this case.  The court held in Mattiola Construction that liquidated damages Mattiola was obligated to pay on account of delays created by damage it did to a bridge were covered by its CGL policy, because that policy, like the CGL policy at issue here, provided coverage for "sums that the insured becomes obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  (Cincinnati Mot. Summ. J., Ex. E at 1 (emphasis added).)  Liquidated damages were covered by the policy in Mattiola Construction because the construction company was obligated to pay damages arising from the property damage it inflicted on the bridge.  So too here.  If Fab Tech is obligated, as a result of the Peerless action, to pay the costs Lason incurred in moving and storing documents because of the damage inflicted on those documents (and the building in which they were stored) then those costs are damages Fab Tech is legally obligated to pay because of property damage to which the Cincinnati CGL policy applies.

The conclusion that Cincinnati is obligated, under Pennsylvania law, to cover economic damages resulting from covered property damage follows directly from the resolution in Mattiola Construction, and it is consistent with holdings in several other jurisdictions.  See, e.g., Jacob v. Russo Builders, 592 N.W.2d 271, 277 (Wis. Ct. App. 1999) (explaining, in suit by homeowner against builders for faulty construction that "damages such as relocation costs . . . represent . . . costs associated with addressing and correcting that situation . . . which can be recovered in tort, and . . . are covered by West Bend's CGL policy"); Cyprus Amax Minerals Co. v. Lexington Ins. Co., 74 P.3d 294, 306 (Colo. 2003) ("We find no authority showing that liability cannot include a mix of property damages and other kinds of damages."); Amerisure Ins. Co. v. ML & Assocs., Inc. (In re ML & Assocs., Inc.), 302 B.R. 857, 861 (Bankr. N.D. Tex. 2003) (granting insured's motion for summary judgment on theory that loss of use of building due to damage to the building was covered "property damage").

If Federal obtains a judgment against Fab Tech in the Peerless action, Cincinnati will be obligated to indemnify Fab

Tech for expenses arising from Lason's efforts to repair damage
to documents it stored, as well as expenses involved in dealing
with the loss of use of the damaged building during its
reconstruction, including reasonable costs associated with moving
documents to and from a temporary storage facility and of leasing
any such facility.  The latter expenses were incurred because of
property damage to which the insurance applies, and qualify as
property damage in their own right, because they arose from loss
of use occasioned by physical injury to tangible property.  In
other words, Lason's "extra expenses" are covered by the plain
language of the CGL policy.

To summarize, regarding Count I, Cincinnati is obligated to
indemnify Fab Tech for any damages it must pay Peerless for
property damage to those portions of Crowning's building that
fall outside the "your work" exclusion, i.e., all the building
components not fabricated by Fab Tech, and Cincinnati is also
obligated to indemnify Fab Tech for the full ranges of damages it
must pay Lason for drying documents, moving documents to and from
a temporary storage facility, and operating that temporary
facility.

24

II. Count II: North American's Duty to Fab Tech

In Count II, Cincinnati asserts that it has no obligation to defend and indemnify Fab Tech in the <u>Peerless</u> action, but North American does have such an obligation.  As a result, Cincinnati says North American is liable for defense costs Cincinnati has already incurred in defending the <u>Peerless</u> action in state court.

All agree that the North American policy issued to Fab Tech was a "claims made" policy - one that required North American to defend claims made against Fab Tech for "wrongful acts" committed during the policy period, or "prior to the **policy period** but on or after the **retroactive date**, if any . . . ."  (Cincinnati's Mot. Summ. J., Ex. J at 10.)  The policy included a retroactive date of November 8, 1999.  (<u>Id.</u> at 1.)  Cincinnati argues that because the <u>Peerless</u> complaint did not specify precisely when Fab Tech allegedly committed the wrongful act(s) for which it was being sued, North American was obligated to defend Fab Tech until a court determined that Fab Tech's wrongful act(s) occurred before the retroactive date.  North American counters that it was relieved of any obligation to defend Fab Tech as soon as it determined that the wrongful act for which Fab Tech sought

25

coverage – its design and fabrication of the building that collapsed – took place before the retroactive date stated in the policy.  North American is correct.

Under Pennsylvania law, an "insurer's obligation to defend is fixed solely by the allegations in the underlying complaint," Erie Ins. Exch. v. Muff, 851 A.2d 919, 926 (quoting Aetna Cas. & Sur. Co. v. Roe, 650 A.2d 94, 98 (Pa. Super Ct. 1994)), and "the insurer owes a duty to defend if the complaint against the insured alleges facts which would bring the claim within the policy's coverage if they were true." Id. (citation omitted). However, "[n]ot all claims asserted against an insured . . . activate the insurer's duty to defend." Id.  "The duty to defend is limited to only those claims covered by the policy." Aetna, 650 A.2d at 98 (citing D'Auria v. Zurich Ins. Co., 507 A.2d 857, 859 (Pa. Super. Ct. 1986)) (emphasis in the original).  Finally, "the duty to defend remains with the insurer [only] until it is clear the claim has been narrowed to one beyond the terms of the policy." Bd. of Pub. Educ. v. Nat'l Union Fire Ins. Co., 709 A.2d 910, 913 (Pa. Super. Ct. 1998) (citing Britamco Underwriters, Inc. v. Weiner, 636 A.2d 649, 652 (Pa. Super. Ct.

1994); <u>Stidham v. Millvale Sportsmen's Club</u>, 618 A.2d 945, 953-54
(Pa. Super. Ct. 1992)).


Here, the writ of summons in the <u>Peerless</u> action alleges no
conduct of any kind by Fab Tech that took place on or after
November 8, 1999, the retroactive date established in the policy
North American issued to Fab Tech.  To the contrary, the writ
incorporated by reference a copy of the agreement between
Crowning and Seacoast, the general contractor, which called for
Seacoast's work – which necessarily included Fab Tech's work – to
be completed within fourteen weeks of site plan approval or
issuance of a building permit.  The complaint alleges no facts
that would support a finding that the municipal approval process
delayed the construction process such that any of Fab Tech's work
(as Seacoast's subcontractor) took place on or after November 8,
1999.  Thus, the allegations in the underlying complaint, even if
proven true, are insufficient to bring the <u>Peerless</u> claim within
the coverage of North American's policy.


In Cincinnati's view, the failure of the <u>Peerless</u> complaint
to "set forth any allegations that conclusively establish when

Fab Tech completed its duties relative to the design, fabrication and construction of the building at issue . . . [creates] the potential that Peerless and/or Federal can obtain recovery against Fab Tech based upon a 'wrongful act' after November 8, 1999, thereby triggering [North American]'s duty to defend." Cincinnati bases its argument on both the well-established proposition that "[a]n insurer's duty to defend is a distinct obligation, different from and broader than its duty to indemnify," Erie, 851 A.2d at 925 (citation omitted), and the novel proposition that North American may only be relieved of its duty to defend by a judicial determination that the Peerless claims are outside the scope of coverage.

Pennsylvania courts have repeatedly held that the duty to defend is broader than the duty to indemnify. See, e.g., Erie, 851 A.2d at 925; Board of Public Education, 709 A.2d at 913; Aetna, 650 A.2d at 98; Britamco, 636 A.2d at 651; D'Auria, 507 A.2d at 859. But, as Aetna explains, the duty to defend is broader than the duty to indemnify in the following specific way: "An insured has purchased not only the insurer's duty to indemnify successful claims which fall within the policy's

28

coverage, but also protection against those groundless, false, or fraudulent claims regardless of the insurer's ultimate liability to pay."  650 A.2d at 98 (citation omitted).  But while an insurer has a duty to defend against both meritorious and meritless claims, its duty to defend is not so broad that it is obligated to defend against claims alleging injuries that fall outside the policy's coverage.

Rather, the insurer has a "duty to defend . . . [only] until it is clear the claim has been narrowed to one beyond the terms of the policy."  Board of Public Education, 709 A.2d at 913 (citation omitted).  Here, it was clear to North American over a year before the Peerless action was filed that Fab Tech had committed no potentially actionable wrongful acts on or after the retroactive date.  And, indeed, the Peerless writ contained no factual allegations concerning any relevant acts by Fab Tech occurring on or after November 8, 1999.[6]  If the Peerless writ had alleged acts by Fab Tech after the retroactive date, then,

---

[6] The correctness of North American's determination that no possible claim against Feb Tech could be within the terms of the policy was confirmed by the uncontradicted admissions of both Seacoast and Fab Tech that their work on the building that collapsed was fully completed prior to November 9, 1999.

perhaps, North American would have been obligated to provide a defense up to the point when the <u>Peerless</u> action no longer contained any claims based upon acts by Fab Tech occurring on or after the retroactive date.  But that is not this case.

There is no suggestion in any of the cases applying the rule stated in <u>Board of Public Education</u> that an insurer is obligated to provide a defense until <u>a</u> <u>court</u> determines that a claim lies beyond the terms of the relevant insurance policy.  In an opinion cited by the Pennsylvania Superior Court, Judge Learned Hand once explained that "[i]n most cases . . . it will not be difficult for the insurer to compel the injured party to disclose whether the injury is within the policy; and, if it transpires that it is not, the insurer need go on no longer."  <u>Lee v. Aetna Cas. & Sur. Co.</u>, 178 F.2d 750, 752 (2d Cir. 1949) (cited in <u>Stidham</u>, 618 A.2d at 954); <u>see also</u>, <u>Lucker Mfg. v. Home Ins. Co.</u>, 23 F.3d 808, 813 (3d Cir. 1994) (applying Pennsylvania law) ("[The] duty to defend remains with the insurer until facts sufficient to confine the claims to liability not within the scope of the policy <u>become known to the insurer</u>.") (emphasis added, citations omitted); <u>Charter Oak Fire Ins. Co. v. Sumitomo Marine & Fire Ins. Co.</u>, 750

F.2d 267, 272 (3d Cir. 1984) (applying Pennsylvania law)
(explaining that insurer is relieved of its duty to defend "until
it can confine the claim to a recovery excluded from the scope of
the policy") (emphasis added, citations omitted).

Finally, the theory on which North American relies – that
the Peerless writ's silence regarding when Fab Tech's alleged
wrongful acts occurred creates the possibility that they occurred
on or after the retroactive date, thereby imposing upon North
American a duty to defend – has been rejected by at least one
Pennsylvania court.  In Aetna, a teacher, her husband, and a
fellow teacher were sued by a set of parents, on behalf of their
children, for committing, "inter alia . . . [various] specific
acts of sexual, physical and mental abuse."  650 A.2d at 96.  Two
of the underlying defendants, a teacher and her husband, made a
claim for defense and indemnification on their comprehensive
homeowners insurance policy.  Id. at 97.  The insurer, in turn,
sought a declaratory judgment and argued, on summary judgment,
that it was relieved from its duty to provide a defense by the
policy's exclusions of coverage for bodily injuries that are
expected or intended by the insured, and personal injuries

31

resulting from criminal acts.  <u>Id.</u>  In ruling against the
insureds, the Pennsylvania Superior Court rejected their argument
that even though the underlying complaint enumerated only
intentional criminal acts, its use of the phrase "<u>inter alia</u>"
created the possibility that the underlying plaintiffs might also
be attempting to recover damages for other unenumerated
unintentional non-criminal acts which would be outside the scope
of the policy exclusion.  <u>Id.</u> at 98 ("Aetna was bound, appellants
submit, to remain in the action until any ambiguity which arose
from the use of the proviso "<u>inter alia</u>" was resolved. . . .  We
disagree.").

Because the facts alleged in the <u>Peerless</u> writ did not
implicate the coverage provided by the policy North American
issued to Fab Tech, and because it is undisputed that Fab Tech's
design and fabrication of the building was completed before
November 8, 1999, North American is not obligated to defend Fab
Tech against the <u>Peerless</u> action.  Accordingly, North American is
entitled to Summary Judgment on Count II.

III. Attorneys' Fees

Relying upon N.H. Rev. Stat. Ann. ("RSA") § 491:22-b, Fab
Tech requests attorneys' fees, while Federal, without citation to
authority, seeks reasonable costs and attorney's fees.
Cincinnati objects to both requests, arguing that: (1) it is not
liable for Fab Tech's fees because it never denied coverage to
Fab Tech and because it will prevail in the declaratory judgment
action; and (2) it is not liable for Federal's costs and fees
because there is no legal basis for deviating from the general
rule that each party is responsible for its own attorneys' fees
and costs.

Turning first to Fab Tech's request, RSA 491:22-b provides
that "[i]n any action to determine coverage of an insurance
policy pursuant to RSA 491:22, if the insured prevails in such
action, he shall receive court costs and reasonable attorneys'
fees from the insurer."  Cincinnati's declaratory judgment action
founded on diversity jurisdiction, naming Fab Tech as a
defendant, plainly qualifies as "action to determine coverage of
an insurance policy pursuant to RSA 491:22," and Cincinnati does
not contest the applicability of RSA 491:22-b to the facts of

this case.  Rather, Cincinnati contends that Fab Tech is not
entitled to attorneys' fees because Cincinnati never denied
coverage and, in fact is currently defending Fab Tech in the
<u>Peerless</u> action subject to a reservation of rights.

There is no requirement that an insured must suffer a denial
of coverage before it is entitled to an award under RSA 491:22-b.
Moreover, there can be no doubt Cincinnati, by defending Fab Tech
under a reservation of rights and by claiming in this action that
it has no duty to defend or indemnify Fab Tech, has disputed
coverage.  Fab Tech has been forced to litigate against
Cincinnati in order to obtain the insurance coverage to which it
is contractually entitled.  In other words, the mere fact that
Cincinnati has not formally denied coverage to Fab Tech is no bar
to an award of attorneys' fees under RSA 491:22-b.  <u>Cf.</u> <u>Binda v.</u>
<u>Royal Ins. Co.</u>, 144 N.H. 613, 616-17 (2000) (holding that RSA
491:22 "does not, as Binda suggests, require an actual denial of
coverage by an insurer before an insured must seek a
determination of coverage or risk being time-barred").  Because
the absence of a formal denial of coverage is no bar to obtaining
an award of attorneys' fees, and because Fab Tech has prevailed

in this action, Fab Tech is entitled to court costs, if any, and
reasonable attorneys' fees from Cincinnati.

Federal, however, is not entitled to an award of costs and
attorneys' fees from Cincinnati.  While Federal has prevailed in
this action, Federal stands in the shoes of its subrogor, Lason,
and Lason is not an "insured" vis à vis Cincinnati.  RSA 491:22-b
limits shifting of costs and fees to insureds who prevail in
suits seeking to obtain coverage from their insurers.  Cf.
Liberty Mut. Ins. Co. v. Home Ins. Indem. Co., 117 N.H. 269, 271-
72 (1977) ("The purpose of RSA 491:22-b (Supp. 1975) is to
protect consumers against wrongful refusal of insurance companies
to provide coverage.") (citation omitted).  Rather than being
Cincinnati's insured, or subrogated to Cincinnati's insured,
Federal a/s/o Lason is in effect bringing a tort claim against
Cincinnati's insured (Fab Tech).  Federal, therefore, is like the
underlying tort claimant who was denied costs and attorney's fees
from the tortfeasor's insurance company in Providence Mutual Fire
Insurance Company v. Scanlon, 138 N.H. 301, 307 (1994) (citing
Am. Home Assur. Co. v. Star Speedway, Inc., 119 N.H. 954, 955
(1979)).  In other words, for purposes of its dispute with

35

Cincinnati, Federal is not a consumer of insurance, but a claimant against Cincinnati's insured, and, because it is not seeking to enforce coverage under a policy issued to it by Cincinnati, Federal is not entitled to costs or fees under RSA 491:22-b.

IV. Findings of Fact

In its motion for summary judgment, Peerless asks the court to issue an order finding that "[t]he roof of the building located at 527 Mammoth Road, Londonderry, New Hampshire failed on March 14, 2001" and that "[t]he roof failed due to inadequately sized purlin clips." Cincinnati objects on grounds that Peerless is asking this court to decide factual matters that are uncontested in this action, but disputed in the underlying Peerless action. The legal issues in this case have been resolved without the necessity of deciding the two factual issues identified by Peerless. Accordingly, the court declines to make the requested findings. See, Howard v. Hartford Ins. Co., 127 N.H. 727, 730 (1986) (quoting U.S. Fid. & Guar. Co. v. Johnson Shoes, Inc., 123 N.H. 148, 154 (1983)) (explaining that this

court's factual findings would have preclusive effect in the underlying action).

## Conclusion

Cincinnati's motion for summary judgment (document no. 61) is denied.  North American's motion for summary judgment (document no. 62) is granted.  Peerless's motion for summary judgment (document no. 63) is granted.  Fab Tech's motion for summary judgment (document no. 64) is granted.  Federal's motion for summary judgment (document no. 66) is granted in part and denied in part.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

June 24, 2005

cc:  Adam M. Barnes, Esq.
     Doreen F. Connor, Esq.
     David W. Johnston, Esq.
     Charles A. Jones, Esq.
     Edward M. Kaplan, Esq.
     Matthew F. Noone
     Andrew W. Serell, Esq.
     John P. Sherman, Esq.
     James Q. Shirley, Esq.

37